IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAMON JIMENEZ, | : | |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BEST BEHAVIORAL | : | |
| HEALTHCARE, INC. et al., | : | No. 18-1003 |
| *Defendants.* | : | |

## MEMORANDUM OPINION

PRATTER, J.                                                                                      JUNE 4, 2019

No one disputes that Ramon Jimenez was never paid at any time he provided services to Best Behavioral Healthcare, Inc. The question presented by the parties' cross-motions for summary judgment, therefore, is whether to classify Mr. Jimenez as an employee—entitled to back pay under the Fair Labor Standards Act—or an independent contractor—unprotected under the FLSA. Looking to the economic realities, the Court concludes that Mr. Jimenez was effectively an employee and is entitled to $8,170.75 in back pay. Separately, the Court concludes that summary judgment is improper on Mr. Jimenez's Pennsylvania Wage Payment Collection Law claim.

### UNDISPUTED FACTS

Best Behavioral Healthcare is a mental health provider for individuals with special needs, and Amarilis LaFontaine is a doctor and the president and CEO of BBH. Ramon Jimenez worked as a psychotherapist at BBH from October 27, 2016 until April 10, 2017.

### I.       Scope of Mr. Jimenez's Role at BBH

When retained by BBH, Mr. Jimenez (1) was told that he was "going to be an independent contractor," Defs. Mot. for Summary Judgment, Ex. A at 26:10–12 (Jimenez Depo. Tr.), and (2) understood that he was a Form 1099 employee, or contractor, for BBH's tax purposes. Id. at

1

90:20–22.   Specifically, BBH retained Mr. Jimenez as a psychotherapist.   Mr. Jimenez's

"responsibilities" were as follows:

> Initial assessment, comprehensive treatment plan, update and reviews.   Progress
> notes based on regular follow-up of patients, individual, couple, family and group
> therapy as clinically indicated, psychosocial assessment.   Referral for services, and
> Discharge planning.   The psychiatrist heading the treatment team controls the
> activities concerning patient treatment.   The psychotherapists report to the Medical
> Director concerning clinical duties.

Defs. Motion for Summary Judgment, Ex. 5 to Ex. A (Job Description, Psychotherapist).

Mr. Jimenez also executed a Service Agreement, which described Mr. Jimenez's

compensation and some of his responsibilities at BBH.   According to the Service Agreement, Mr.

Jimenez would earn $28 "per patient hour billed."   Pltff. Mot. for Summary Judgment, Ex. A at 1

(Service Agreement).   The Service Agreement also provided that Mr. Jimenez:

- Agreed to "comply faithfully with the rules and regulations of BBH and its various subdivisions";

- Agreed to "adhere strictly to the instructions and directions of BBH's president, directors, department coordinators and assistants, their designees and/or [Mr. Jimenez's] chief of service";

- Agreed not to "engage in any medical or mental health services activities, nor directly or indirectly, to own, manage, or invest in or be associated in any way with the practice of psychotherapy or counseling other than through BBH, except with the written permission of BBH";

- Agreed not to, upon his resignation (and for one year after), "engage in the business of [being a] psychotherapist, counselor, or related field within a radius of five miles of BBH's clinic"; and

- Agreed not to, upon his resignation or termination, "contact [his] former clients."

Id. at 1–2.

Mr. Jimenez signed several other documents, each of which also addressed the terms of

BBH's relationship with its psychotherapists.   The documents included a Receipt and

2

Acknowledgement of the terms of BBH's Employee Manual,[1] a Disciplinary Agreement, a Dress Code/Professional Appearance Policy, and a Professional Code of Ethics. Finally, BBH required that psychotherapists comply with more than 30 "Policies and Procedures." Among other things, those materials:

- prohibited BBH psychotherapists from "[l]eaving work before the end of a workday or not being ready to work at the start of a workday without approval";

- prohibited BBH psychotherapists from "[l]eaving [their] work station during [their] work hours without the permission of [their] supervisor, except to use the restroom";

- prohibited BBH psychotherapists from "seek[ing] any professional or political gain at the expense of the agency or client's interest"; and

- established procedures for writing and submitting session notes.

See Pltff. Mot. for Summary Judgment, Ex. J (BBH Employee Manual); see also Pltff. Mot. for Summary Judgment, Exs. N–S.[2]

In addition to placing restrictions and conditions on psychotherapists, BBH was responsible for paying for or reimbursing employees for various expenses, including cleaning supplies, credit card processing, office supplies, and office space.

---

[1]    BBH argues that many of the provisions of the Employee Manual did not apply to independent contractors. But the Employee Manual, by its own terms, states that "[u]nless otherwise specified, the benefits described in this Manual apply only to full-time employees. All other policies described in this manual and communicated by [BBH] apply to all employees, with the exception of certain wage, salary and time off limitations applying only to 'non-exempt' (see the definition that follows) employees." Pltff. Mot. for Summary Judgment, Ex. J at 11 (BBH Employee Manual) (emphasis added). The distinction between "exempt" and "non-exempt" employees refers to entitlement to overtime pay. Id. at 12. The fact that BBH required Mr. Jimenez to sign a Receipt and Acknowledgement of the terms of the Employee manual undermines BBH's argument that the manual did not bind Mr. Jimenez.

[2]    Pltff. Mot. for Summary Judgment, Ex. N (BBH Professional Code of Ethics); Pltff. Mot. for Summary Judgment, Ex. O (BBH Dress Code/Professional Appearance Policy); Pltff. Mot. for Summary Judgment, Ex. P (BBH Disciplinary Agreement); Pltff. Mot. for Summary Judgment, Ex. Q (BBH Policies and Procedures); Pltff. Mot. for Summary Judgment, Ex. R (Progress/Session Notes Policy); Pltff. Mot. for Summary Judgment, Ex. S (Ramon Jimenez's Receipt and Acknowledgement of Employee Manual).

## II.        Mr. Jimenez's Tenure at BBH

During Mr. Jimenez's approximately six months working at BBH, he estimated that he worked eight hours a day, five days a week, with another four to six hours on weekends. Although the BBH Employee Manual placed limitations on when employees could—or could not—leave work, BBH in practice did not keep track of Mr. Jimenez's comings and goings and did not require nor permit Mr. Jimenez to clock in or out. Mr. Jimenez paid his own insurance premiums during the time he worked at BBH.

Dr. LaFontaine was Mr. Jimenez's supervisor at BBH. Dr. LaFontaine hired Mr. Jimenez and signed or authorized most of Mr. Jimenez's onboarding paperwork. During her time as Mr. Jimenez's supervisor, Dr. LaFontaine disciplined Mr. Jimenez on several occasions for taking incomplete notes during appointments. Mr. Jimenez also routinely turned in his appointment notes late. According to Dr. LaFontaine and other BBH employees, BBH did not pay Mr. Jimenez because of the issues with his session notes. Dr. LaFontaine eventually terminated Mr. Jimenez because of those same issues.[3] Mr. Jimenez never received any payment from BBH.

### LEGAL STANDARD

A court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[3]        It is unclear from the record whether, during his time at BBH, Mr. Jimenez saw patients on the side, in violation of the Service Agreement and Employee Manual. Mr. Jimenez submitted a declaration stating that he "did not receive any income for any work performed for any other company or person" other than BBH. See Pltff. Mot. for Summary Judgment, Ex. M ¶ 11 (Declaration of Ramon Jimenez). Dr. LaFontaine, however, testified that Mr. Jimenez told her that he was working for an outside organization seeing patients. See BBH Mot. for Summary Judgment, Ex. E 147:5–148:16 (Deposition of Amarilis LaFontaine). Because this fact is disputed and the parties do not present documentary evidence supporting their opposing assertions, the Court does not credit either side's argument on this point. In other words, the Court will not weigh in Mr. Jimenez's favor that he did not see outside patients, nor will the Court weigh in BBH's favor that Mr. Jimenez did see outside patients.

Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id. (citing Anderson, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party and draw all evidences in that party's favor. Id. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Where the non-moving party bears the burden of proof on a particular issue, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." Id. at 325 (cleaned up). After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

5

DISCUSSION

Both Mr. Jimenez on the one hand and BBH and Dr. LaFontaine on the other move for summary judgment.

Mr. Jimenez argues first that BBH is an enterprise covered by the FLSA.  The defendants do not submit any argument rebutting that the FLSA applies.  Likewise, Mr. Jimenez argues that Dr. LaFontaine is an "individual employer" under the FLSA—triggering FLSA liability individually—a designation to which neither BBH nor Dr. LaFontaine objects.  Because the defendants do not dispute the applicability of the FLSA, the Court determines that any counter-argument is waived.

Instead, the only issues are (1) whether Mr. Jimenez was an independent contractor or an employee, (2) if Mr. Jimenez was an employee, the amount of damages, and (3) whether Mr. Jimenez's Pennsylvania Wage Payment and Collection Law claim survives summary judgment.

## I.      Whether Mr. Jimenez Was an Employee or Independent Contractor

If Mr. Jimenez was an employee, the FLSA applies and he is entitled to minimum wage and overtime compensation for the time he worked at BBH.  If Mr. Jimenez was an independent contractor, the statute is inapplicable.  See, e.g., Tourscher v. McCullough, 184 F.3d 236, 242 (3d Cir. 1999) ("The minimum wage provisions of the FLSA . . . apply only to workers who are 'employees' within the meaning of the Act.").

The question of whether, under the FLSA, a plaintiff is an independent contractor or an employee is a question of law for the Court.  See Martin v. Selker Bros., 949 F.2d 1286, 1292 (3d Cir. 1991) ("The employment status of the station operators is a legal conclusion.").  The plaintiff has the burden to establish that he is an employee under the FLSA.  See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686–87 (1946) (A plaintiff "who brings suit under the [FLSA] has the burden of proving that he performed work for which he was not properly compensated.").

Because the Supreme Court has "consistently construed" the FLSA "liberally to apply to the furthest reaches consistent with congressional direction, recognizing that broad coverage is essential to accomplish the [Act's] goal[,]" Tony & Susan Alamo Foundation v. Sec'y of Labor, 471 U.S. 290, 296 (1985), the FLSA's statutory definitions regarding employment status are "necessarily broad to effectuate the remedial purposes of the Act." Selker Bros., 949 F.2d at 1293. As a result, courts look to the "economic realities" of the employment relationship in determining whether a worker is an employee or independent contract. Id. (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)).

In assessing those economic realities, labels are not dispositive. In Rutherford, the Supreme Court explained that "[w]here the work done, in essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]." 331 U.S. at 729.[4] Courts therefore conduct a wholistic analysis, looking in particular to six factors to determine whether a worker is an employee:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanence of the working relationship; and
>
> 6) whether the service rendered is an integral part of the alleged employer's business.

Selker Bros., 949 F.2d at 1293 (citations omitted); see also Donovan v. DialAmerica Marketing, Inc., 757 F.2d 1376, 1385 (3d Cir. 1985) (stating same).

The Court addresses each factor in turn.

---

[4]   For this reason, it is of no moment that Mr. Jimenez initially believed he was being hired as an "independent contractor." *See supra* at pp. 1–2.

**A. The Economic Realities Factors**

**1. BBH's Right to Control the Manner Work Performance**

"With respect to the control factor," relevant evidence "includes the degree of supervision over the worker, control over the worker's schedule, and instruction as to how the worker is to perform his or her duties." Bamgbose v. Delta-T Grp., Inc., 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010). Although Selker Bros. and Donovan describe this factor in terms of the employer's "right to control," district courts in the Third Circuit have separately emphasized either employers' ability to control purported employees or employers' actual exercise of control. Compare Razak v. Uber Techs., Inc., No. 16-573, 2018 WL 1744467, at *14 (E.D. Pa. Apr. 11, 2018) ("[A]ctual control of the manner of work is not essential; rather it is the right to control which is determinative.") (quotation and citation omitted, emphasis added) with Spellman v. Am. Eagle Exp., Inc., No. 10-1764, 2013 WL 1010444, at *4 (E.D. Pa. Mar. 14, 2013) ("Under the FLSA, an alleged employer's degree of control over its alleged employees is determined by examining the employer's actual control, not its right to control.") (citation omitted, emphasis in original). Here, BBH had both the right to control the psychotherapists and also exercised that control over Mr. Jimenez in practice.

First, the record shows that BBH had the right to control Mr. Jimenez. The Employee Manual, the Service Agreement, and BBH's other policies and procedures include provisions dictating BBH's control over its staff. BBH was entitled to control, among other things,

(1) how Mr. Jimenez could end his tenure at BBH, Pltff. Mot. for Summary Judgment, Ex. A at 2 (Service Agreement);

(2) Mr. Jimenez's rate of pay, id.;

(3) the mental health care providers with whom Mr. Jimenez could work while employed at BBH, id. at 2–3;

(4) whether Mr. Jimenez could practice therapy for a year after leaving BBH, id. at 3;

8

(5) the amount of time Mr. Jimenez was to spend in his workspace at BBH, Pltff. Mot. for Summary Judgment, Ex. J at 24–25 (BBH Employee Manual);

(6) when Mr. Jimenez could take lunch, id. at 25;

(7) what Mr. Jimenez wore to work, id. at 39; see also Pltff. Mot. for Summary Judgment, Ex. O;

(8) whether Mr. Jimenez was subject to discipline, Pltff. Mot. for Summary Judgment, Ex. P (Disciplinary Agreement);

(9) whether Mr. Jimenez's services were billed, Pltff. Mot. for Summary Judgment, Ex. V at 86:12–25 (Salcedo Depo. Tr.); and

(10) the administration of BBH's session notes policy, Pltff. Mot. for Summary Judgment, Ex. R (Progress/Session Notes Policy).

Second, BBH also exercised control over Mr. Jimenez in practice. BBH did not pay Mr. Jimenez at any point for therapy services Mr. Jimenez rendered. Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 90 (admitting that "BBH never paid Plaintiff at all."). BBH also "intervened" in Mr. Jimenez's work both administratively and clinically. Id. ¶ 80. Mr. Jimenez's supervisor, Dr. LaFontaine, testified:

> It can be clinical supervision in that [Mr. Jimenez] has done something that is not clinically sound or he's not doing an administrative aspect of the – he's not doing his job. . . .   In the administrative aspect, [Mr. Jimenez] was not providing information for clinical record for the state and the federal government for clients that he had been seeing, right? That's administrative. You got to do your job. In the clinical aspect, when I went to check notes, there was repetition, cut and paste, that is something that is more clinical. You can't cut notes and paste it in another clients. That's when we started unfolding all these problems.

Pltff. Mot. for Summary Judgment, Ex. D at 31:19– 32:14 (Dr. LaFontaine Depo. Tr.). In other words, BBH controlled both the manner in which Mr. Jimenez maintained notes for billing purposes and the way that Mr. Jimenez actually conducted himself while providing therapy.

Because BBH controlled Mr. Jimenez administratively and clinically, this case is distinguishable from Leffler v. Creative Health Servs., Inc., No. 16-1443, 2017 WL 4347610 (E.D. Pa. Sept. 29, 2017). In Leffler, the Court commented that, with regards to therapists, employers'

control is limited because therapists can "determine[] the professional aspects of their therapies and set their own schedules [and] '[s]upervision' [i]s limited to billing issues (such as keeping proper records) to ensure that [the owner] and other therapists w[ill] be paid." Id. at *7. But here, supervision was not "limited to billing issues;" BBH actually controlled a number of the "professional aspects" of Mr. Jimenez's provision of therapy.

On balance, BBH's right to control and its exercise of control weigh in favor of employee status.

### 2. Mr. Jimenez's Opportunity for Profit or Loss Based on His Managerial Skill.

The undisputed fact that Mr. Jimenez worked for BBH for about six months without ever receiving a paycheck strongly shows that his managerial skill did not affect his opportunity for profit and loss. See Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 90. The defendants argue that because Mr. Jimenez was not paid a set salary, and instead could earn varying amounts depending on how many hours he worked, this indicates Mr. Jimenez controlled his opportunities for profit. See Safarian v. Am. DG Energy Inc., No. CV 10-6082, 2015 WL 12698441, at *4 (D.N.J. Nov. 24, 2015), aff'd, 729 Fed. App'x 168 (3d Cir. 2018) ("Given that Plaintiff was not paid a set salary and had the opportunity to take on more work to make a larger profit, this indicates that Plaintiff had a meaningful opportunity for profit or loss."). But unlike in Safarian, there was an additional obstacle to payment here; even though Mr. Jimenez could work additional hours if he chose, he could not be paid without getting his notes approved by BBH. As previously described, BBH's review of Mr. Jimenez's notes was substantive rather than perfunctory, and so Mr. Jimenez's "opportunity for profit' was entirely contingent on BBH. Even if Mr. Jimenez saw patients all day every day, he was still beholden to BBH to approve and then submit his notes in order to be paid. This factor weights in favor of employee status.

### 3. Mr. Jimenez's Investment in Equipment or Materials or Employment of Helpers.

Mr. Jimenez was responsible for paying his insurance.  Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 63.  The defendants also assert that Mr. Jimenez maintained his own license status and paid for his participation in continuing professional education.  However, the deposition testimony from Dr. LaFontaine directly contradicts that Mr. Jimenez had a professional license, and instead suggests that BBH was indirectly responsible for covering licensure costs associated with Mr. Jimenez.  Pltff. Mot. for Summary Judgment, Ex. D at 31:19– 32:14 (Dr. LaFontaine Depo. Tr.) ("In our case, Ramon [Jimenez] didn't have [a] license, so he's an unlicensed clinician, so he has to be under my license supervision basically.").  Mr. Jimenez also could not hire co-workers or support staff—only BBH could—and BBH paid for all office supplies, paid for the office in which Mr. Jimenez worked, and paid for bill collection.  Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶¶ 58–61, 65 (admitting BBH's operational costs and control over staffing).  Even though, as noted by the defendants, psychotherapy may not be a profession requiring the provision of much in terms of "equipment or materials," BBH's investment was far more significant than that of Mr. Jimenez.  This factor weighs in favor of employee status.

### 4. Whether Psychotherapy Is a Special Skill.

The parties do not dispute that psychotherapy is a special skill and that this factor weighs in favor of independent contractor status.  But, as Mr. Jimenez points out (and the defendants do not refute), an employee's training carries less weight where the worker "depended entirely on referrals to find job assignments" and the company "controlled the terms and conditions of the employment relationship."  Brock v. Superior Care, Inc., 840 F.2d 1054, 1060 (2d Cir. 1988); see also Selker Bros., 949 F.2d at 1295 ("[T]he use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way.").  Because BBH controlled the terms of Mr. Jimenez's employment, including its complete

11

control over compensation, the impact of Mr. Jimenez's skill on the Court's analysis is therefore minimal.

Additionally, the defendants argue that because Mr. Jimenez was a psychotherapist, he is a "learned professional," exempt from FLSA coverage under 29 U.S.C. § 213(a)(1). The exemption does not apply here, however. Under the implementing regulations, a qualifying "learned professional" must satisfy certain requirements, including that the employee be compensated "on a salary or fee basis." See 29 C.F.R. § 541.300(a). But Mr. Jimenez's salary was indeterminate. Although Mr. Jimenez had a set hourly rate of pay, his take-home income would vary depending on the number of patients he saw in a given day. As such, Mr. Jimenez was not paid on a salary or fee basis. See Cuttic v. Crozer-Chester Med. Ctr., 760 F. Supp. 2d 513, 515–16 (E.D. Pa. 2011) (employee paid on "hourly basis and, accordingly, [whose] wages are wholly dependent upon how much time [he] works" was "not compensated on a salary or fee basis" and did not qualify for learned professional exemption).

### 5.  The Degree of Permanence of the Working Relationship.

The permanence factor turns on two considerations: (1) whether the employee had a set term with the employer, and (2) whether the employee also took outside work. See Donovan, 757 F.2d at 1387. In Donovan, the court held that this factor weighed in favor of employee status because the alleged employees "did not transfer their services from place to place, as do independent contractors. Each worked continuously for the defendant, and many did so for long periods of time." Id. at 1385 (citation omitted). Likewise, in Selker Bros., the court affirmed that the at-issue workers were employees because they "worked exclusively for [the employer] and their tenure appeared to have the length and continuity characteristic of employment." 949 F.2d at 1295.

12

First, Mr. Jimenez did not have a predetermined term of employment. <u>See</u> Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 34 (admitting that Mr. Jimenez's employment term was "open-ended, and not for a set period of time"). And although Mr. Jimenez worked at BBH for six months, several other therapists in the same position are still with BBH and have worked there for years. <u>See</u> <u>id.</u> ¶ 57.

Second, it is not clear from the record whether Mr. Jimenez worked with outside clients. BBH explicitly prohibited outside work (absent BBH's written approval). Pltff. Mot. for Summary Judgment, Ex. A at 2–3 (Service Agreement). Dr. LaFontaine testified that Mr. Jimenez confided in her that he was taking outside clients. Defs. Mot. for Summary Judgment, Ex. E at 147:5–7, 148:14–16 ("[Mr. Jimenez] told me he was working . . . in Journey of Recovery . . . bring[ing] clients from Puerto Rico for recovery."). A second BBH employee, Ms. Salcedo, who worked at BBH in payroll, separately testified that she saw vans of patients being dropped off at BBH, and these patients indicated they were there to see Mr. Jimenez. Defs. Mot. for Summary Judgment, Ex. C at 80:7–82:8 (Salcedo Depo. Tr.). It is unclear from Ms. Salcedo's testimony, however, in what capacity Mr. Jimenez may have been seeing those patients. Mr. Jimenez submitted a rebuttal declaration stating he "did not have any of [his] own patients, and all clients [he] saw were supplied by BBH. No vans of patients ever came to see [him]." Pltff. Opp. to Defs. Mot. for Summary Judgment, Ex. A ¶ 9 (Jimenez Declaration). Mr. Jimenez also denied working for any other facility while working at BBH, including Journey of Recovery. <u>Id.</u> ¶ 11.

Neither Dr. LaFontaine's own self-serving deposition testimony that Mr. Jimenez took outside patients nor Mr. Jimenez's self-serving denial provides persuasive evidence as to whether Mr. Jimenez engaged in outside work. <u>See</u> <u>Irving v. Chester Water Auth.</u>, 439 F. App'x 125, 127 (3d Cir. 2011) ("[S]elf-serving deposition testimony is insufficient to raise a genuine issue of material fact."); <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 608 (3d Cir. 2002) ("[C]onclusory,

13

self-serving affidavits are insufficient to withstand a motion for summary judgment.").  Dr. LaFontaine does not explain, for example, why, if she knew Mr. Jimenez was seeing outside patients in violation of the Service agreement, she did not reprimand Mr. Jimenez or otherwise prohibit him from continuing this practice.[5]  Further, Ms. Salcedo's testimony, about Mr. Jimenez seeing vans full of patients at BBH, appears to lack personal knowledge as to the origin of the patients (Ms. Salcedo merely guesses that the patients were from an outside organization), and is also inconsistent.  Ms. Salcedo first stated that she was "not aware of any other issues . . . with Mr. Jimenez's work," Pltff. Reply in Support of Mot. for Summary Judgment, Ex. B at 25:14–16 (Salcedo Depo. Tr.), before much later adding that she saw vans of patients coming to BBH and that she believed those patients were coming to visit Mr. Jimenez.

Because the facts are disputed about whether Mr. Jimenez engaged in outside work, the Court does not weigh outside work in Mr. Jimenez's favor or in the defendants' favor.  Instead, the other aspects of Mr. Jimenez's term at BBH, particularly that he was not hired for a limited term and other psychotherapists have worked at BBH for extended periods, suggest that there was a degree of permanence to Mr. Jimenez's position, weighing in favor of employee status.

### 6.  Whether Psychotherapy Is an Integral Part of BBH's Business.

The parties do not dispute that psychotherapy is an integral part of BBH's business.  This factor weighs in favor of employee status.

---

[5]      To the extent that the defendants assert that Dr. LaFontaine gave Mr. Jimenez "tacit consent" to see outside patients, see Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 26, that assertion is unsupported by the record, as the Service Agreement requires "written permission" for outside work rather than tacit approval.  See Pltff. Mot. for Summary Judgment, Ex. A at 2–3 (Service Agreement).  Even accepting this as true, however, it would only further confirm that BBH exercised its control over Mr. Jimenez.

**7. Whether Mr. Jimenez was Dependent on BBH for Continued Employment.**

In addition to the six-factor test, the Third Circuit Court of Appeals has also described an additional factor: whether the alleged employee was dependent on the employer for continued employment. See Donovan, 757 F.2d at 1385 (examining "whether the workers are dependent on a particular business or organization for their continued employment"). Here, Mr. Jimenez's Service Agreement dictated that Mr. Jimenez worked exclusively for BBH and included a non-compete clause that limited his ability to work as a therapist even after he left the company. And although the defendants assert that Mr. Jimenez voluntarily left the therapy field after leaving BBH, there is no evidence supporting this statement. The limitations in Mr. Jimenez's employment agreement indicate that he was dependent on BBH for continued employment and, therefore, support employee status.

**B. Balancing the Economic Realities Factors**

In considering the above factors, the Court must look to the circumstances overall rather than focusing on any one factor. Here, the balance of factors tilts significantly towards determining Mr. Jimenez was an employee. Mr. Jimenez was a skilled worker. But that aside, Mr. Jimenez was subject to BBH's will. Mr. Jimenez could only see BBH patients, Mr. Jimenez could only use BBH facilities, and—perhaps most importantly—Mr. Jimenez could only be paid after BBH substantively reviewed his work product. BBH had the right to control Mr. Jimenez, and it exercised that control, including directing clinical aspects of the position. Additionally, it is significant that Mr. Jimenez was not a term employee and permanence (or long-term employment) appears to have been the rule rather than the exception for BBH psychotherapists. Based on a wholistic analysis of the terms of Mr. Jimenez's employment at BBH, Mr. Jimenez was an employee rather than an independent contractor.

**II.      Mr. Jimenez's Damages**

When an employee brings a claim under the FLSA,

> "he ordinarily bears the burden of proving that he performed work for which he
> was not properly compensated. . . .   Such a burden becomes difficult to meet,
> however, where an employer has not maintained its records.   Under those
> circumstances, the burden of any consequent imprecision in an employee's
> calculation of damages must be borne by the employer, and the employee will only
> be required to submit sufficient evidence from which violations of the FLSA and
> the amount of an award may be reasonably inferred.   Once this inference is created,
> the burden shifts to the employer to rebut that inference."

Rosano v. Twp. of Teaneck, 754 F.3d 177, 188 (3d Cir. 2014) (citations and quotations omitted).

Mr. Jimenez submits, and BBH does not deny, that BBH did not pay Mr. Jimenez.  See

Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 90.  The upshot is that, as an

employee, Mr. Jimenez is entitled to damages under the FLSA in some amount.  See 29 U.S.C. §§

206(a), 207(a).

To determine the amount of damages, the Court would normally look to business records.

But BBH appears to concede that it did not keep or produce detailed records of Mr. Jimenez's time

working at BBH.  Because BBH did not keep records of employees punching in or out, see Defs.

Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 88 (admitting that "BBH maintains a

time-clock, but neither required nor permitted Plaintiff to clock in or out, or to otherwise record

his actual hours"), the only evidence of the amount of time Mr. Jimenez worked comes from Mr.

Jimenez's own testimony.  Where, as here, the employer's payment records are inadequate, an

employee need only prove that he "performed work for which he was improperly compensated"

and produce "sufficient evidence to show the amount and extent of that work as a matter of just

and reasonable inference."  Selker Bros., 949 F.2d at 1297.

Mr. Jimenez submits that he worked on average 46 hours a week for 23 work weeks.  Pltff.

Mot. for Summary Judgment, Stmt. of Facts ¶¶ 67, 89.  Mr. Jimenez extrapolates these numbers

to indicate that he worked 920 "regular hours" (40 hours a week for 23 weeks) and 138 overtime

16

hours (6 hours a week for 23 weeks).  See 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for [the excess hours][.]").  Using a minimum wage of $7.25 for regular hours and time-and-a-half overtime hourly wage of $10.875, Mr. Jimenez argues he is entitled to $8,170.75.  Mr. Jimenez does not seek any additional compensation for the time he spent working with patients.   This Court has used a plaintiff's owns statement as evidence of the amount of time he worked.  See Acosta v. Cent. Laundry Inc., No. CV 15-1502, 2018 WL 1726613, at *3 (E.D. Pa. Apr. 10, 2018) (Plaintiff's statement about time worked created a "just and reasonable inference" of average hours worked in a week).

The defendants do not meaningfully rebut Mr. Jimenez's testimony.  They offer only that Mr. Jimenez was out of the office for several weeks dealing with family issues and saw his own clients at BBH's office three days a week, but no evidence supports these assertions.[6]  Further, although the defendants' corporate representative testified that BBH kept at least some computer records that may have showed when employees were present at BBH, Pltff. Mot. for Summary Judgment, Ex. F at 168:10–19 (Nelson Depo. Tr.), the defendants did not produce those records. In short, the defendants barely make any effort to rebut Mr. Jimenez's testimony about the amount of time he worked while employed by BBH.  They certainly have met no burden.

The Court determines that Mr. Jimenez is entitled to $8,170.75 for 23 weeks of work at BBH.

---

[6]    In the defendants' Opposition to Mr. Jimenez's Motion for Summary Judgment, they cite to portions of the deposition transcript of Ms. Salcedo to establish that Mr. Jimenez missed several weeks of work in the first two months of 2017.  Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 89.  But Ms. Salcedo testified that (1) she was "not sure" how long Mr. Jimenez missed work, (2) that she did not "track" Mr. Jimenez, and (3) that it was "a couple – several days." Defs. Opp. to Pltff. Mot. for Summary Judgment, Ex. C. at 73:8–10 (Salcedo Depo. Tr.).

**C.      Whether the Defendants Are Entitled to Summary Judgment on Mr. Jimenez's Wage Payment Collection Law Claim**

The defendants argue, briefly, that the Court should grant summary judgment on Mr. Jimenez's claim under the Pennsylvania Wage Payment Collection Law. "The WPCL applies only to [unpaid] wages already earned[.]   Whether the particular monies sought are 'wages or compensation' depends upon the term of the contract between the parties. The contract between the parties also determines whether the wages or compensation have been earned." Allende v. Winter Fruit Distributors, Inc., 709 F. Supp. 597, 599 (E.D. Pa. 1989) (citations and quotations omitted).  According to the defendants, "[t]here is no allegation nor record that [Mr.] Jimenez was not paid the compensation set forth in his Independent Contractor Agreements."  Defs. Mot. for Summary Judgment at 22.  But the unrefuted record shows that Mr. Jimenez was never paid at all, see Defs. Opp. to Pltff. Mot. for Summary Judgment, Stmt. of Facts ¶ 90, meaning that Mr. Jimenez was not paid $28 per patient hour, pursuant to his Service Agreement with BBH.  Because the defendants' argument rests entirely on their incorrect assertion that there is no allegation about unpaid wages, summary judgment is improper on this claim.

CONCLUSION

The economic realities of Mr. Jimenez's time at BBH allow only one conclusion:  Mr. Jimenez was BBH's employee.  The Court grants Mr. Jimenez's Motion for Summary Judgment on his FLSA claim for back pay.  The Court also denies the defendants' request for summary judgment on Mr. Jimenez's Pennsylvania Wage Payment Collection Law claim.  An appropriate order follows.

BY THE COURT:

/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE